Laurence M. Rosen (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Lead Counsel for Lead Plaintiff and*
*the Class*

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re GTT Communications, Inc. Securities Litigation | Master File No. 2:21-cv-00270-DOC-AS **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <u>CLASS ACTION</u> JURY TRIAL DEMANDED |
| This Document Relates To: All Actions | |

Lead Plaintiff Arthur Capital Inc. ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, alleges in this consolidated amended complaint the following upon personal knowledge as to allegations specifically pertaining to Plaintiff and, as to all other matters, upon the investigation of counsel, which included, *inter alia*: review and analysis of relevant filings made by GTT Communications, Inc. ("GTT" or the "Company") with the United States Securities and Exchange Commission ("SEC"); review and analysis of Defendants' public statements, public documents, and wire and press releases about the Company; media and analyst reports and advisories about the Company; interviews with confidential witnesses; information from related court filings; and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. Most of the facts supporting the allegations contained herein are known only to Defendants (defined below) or are exclusively within their control.

## NATURE OF THE ACTION

1.     This is a federal securities class action brought on behalf of all persons or entities that purchased or otherwise acquired GTT publicly traded securities from May 5, 2016 through July 30, 2021, both dates inclusive, at artificially inflated prices and were damaged when the artificial inflation dissipated upon a series of corrective disclosures ("Class" and the period from May 5, 2016 through July 30, 2021 is the "Class Period").[1] Plaintiff brings claims

---

[1] Excluded from the Class are: (a) persons who suffered no compensable losses; and (b) Defendants; the present and former officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which any of the Defendants, or any person excluded under this subsection (b), has or had a

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

on behalf of the Class pursuant to sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.     GTT operates a global communications network, providing telecommunications services to large, multinational enterprises, carriers, and governments across five continents.  Throughout the Class Period, GTT stated that its internal controls over financial reporting were "effective" and provided "reasonable assurance" that all required information was being disclosed.

3.     In 2018, GTT acquired Interoute Communications Holdings S.A. ("Interoute"), a European telecommunications company, for $2.3 billion. This was far and away the most important acquisition in the Company's history, dwarfing its other acquisitions. Despite Defendants' assurances that the integration of Interoute would be smooth and quick, the massive and complex integration quickly turned disastrous.

4.     In truth, both in connection with the Interoute acquisition and in the years pre- and post-dating the acquisition, GTT's internal controls over financial reporting were inadequate. This led to years of inaccurate financial reporting in the Company's public financial statements, which were particularly pronounced as the Company tried to paper over the debacle that was the Interoute acquisition.

5.     As a result of GTT's inadequate internal controls, the Company announced after market hours on August 10, 2020 that it would delay its filing of its quarterly report for the quarter ended June 30, 2020.  The Company stated it had identified "certain issues related to the recording and reporting of Cost of Telecommunications Services and related internal controls."

---

majority ownership interest at any time. Also excluded from the Class are members of the 2019 Action Class (defined below).

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

6. On this news, GTT shares fell by $0.65, or over 11%, from closing at $5.61 on August 10, 2020 to close at $4.96 on August 11, 2020.

7. GTT slowly disclosed additional detail about the accounting fraud, as the Company has failed for over one year to file a single quarterly or annual report with the SEC. In December 2020, GTT announced that after a review conducted by the Company's Board of Directors, the Board concluded that the Company's previously issued consolidated financial statements for the years 2017-2019, and each of the quarters from 2018 through the first quarter of 2020 should no longer be relied upon. The Company also disclosed that the Board determined that the Company's disclosures related to these financial statements and related communications by the Company with respect to these periods, including management's assessment of internal control over financial reporting and evaluation of disclosure controls and procedures, should no longer be relied upon.

8. Specifically, as of December 2020, GTT's accounting review identified accounting manipulations resulting in : (1) false accounting for Cost of Telecommunications Services during 2017-2019, and the first quarter of 2020, including (a) the Company's failure to utilize a comprehensive process to record and account for Cost of Telecommunications Services in the proper periods; (b) adjustments made without adequate support that had the effect of pushing back expenses to later quarters; and (c) failures to recognize certain expenses by attributing them instead to goodwill and to pre-acquisition accruals, without adequate support, for companies that had been acquired; (2) pushing back bad debt expenses to later quarters; and (3) misstatement of the reserve for credits to be issued to customers.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

9. These were not trivial accounting errors – this was the manipulation of accounting for tens of millions of dollars representing significant portions of the Company's total net losses.

10. In the aftermath of the disastrous, and ultimately failed, Interoute integration and revelation of the myriad accounting manipulations that foreran and accompanied the acquisition, the Company cleaned house, turning over its top executives including those chiefly responsible for its financial reporting and accounting functions. Defendant Calder was terminated in May 2020. Defendant Sicoli left GTT for a much smaller firm in August 2020. Defendant Fraser left the Company in September 2020, and Defendant Berns in December 2020.

11. In July 2021, after nearly a year had passed without GTT filing its restated financials for the affected periods, completing its internal accounting review, or filing any subsequent quarterly or annual report with the SEC, the NYSE delisted GTT.

12. Plaintiff and the other Class members have suffered significant damages due to Defendants' false and misleading statements and omissions.

## **JURISDICTION AND VENUE**

13. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

14. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

15. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered, the subsequent damages took place in, and the Company maintains locations in this judicial district.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

16.     In connection with the acts, conduct and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

17.     Plaintiff, as set forth in its certification on file with the Court (Dkt. No. 11-2) and incorporated by reference herein, purchased shares of GTT common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

18.     Defendant GTT is incorporated in the state of Delaware, and the Company's principal executive offices are located at 7900 Tysons One Place, Suite 1450, McLean, VA 22102.  GTT securities traded on the New York Stock Exchange ("NYSE") under the symbol "GTT" from the beginning of the Class Period until July 2, 2021. GTT securities traded on OTC markets under the symbol "GTTN" from July 3, 2021 through the end of the Class Period.

19.     Defendant Richard D. Calder, Jr. ("Calder") was the President and Chief Executive Officer ("CEO") of GTT and served in that role from May 2007 until he was terminated at the end of May 2020. Calder also served as a Director on the Company's Board of Directors until his termination. Calder was highly involved in GTT's day-to-day business and in interfacing with its employees. According to GTT's website, Calder had "full strategic and operational responsibility for the [C]ompany."

20.     Defendant Ernie Ortega ("Ortega") was the interim CEO of GTT from July 6, 2020 through the end of the Class Period.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

21. Defendant Michael T. Sicoli ("Sicoli") was the Company's Chief Financial Officer ("CFO") from 2015 until his abrupt resignation from the Company in September 2019.

22. Defendant Daniel M. Fraser ("Fraser") was the Company's interim CFO from September 2019 to April 6, 2020. Fraser also served as the Senior Vice President and Corporate Controller of the Company and GTT's principal accounting officer.

23. Defendant Steven Berns ("Berns") was the Company's CFO from April 6, 2020 through the end of the Class Period.

24. Defendants Calder, Ortega, Sicoli, Fraser and Berns are collectively referred to herein as the "Individual Defendants."

25. Each of the Individual Defendants:

   (a) directly participated in the management of the Company;

   (b) was directly involved in the day-to-day operations of the Company at the highest levels;

   (c) was privy to confidential proprietary information concerning the Company and its business and operations;

   (d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

   (e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

   (f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

   (g) approved or ratified these statements in violation of the federal securities laws.

6

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

26.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

27.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

28.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Company Background

29.     GTT is a telecommunications company and internet service provider. GTT operates a "Tier 1" global network, and provides transport and infrastructure; internet; wide area networking, SD-WAN; managed services; and voice and video services. The company's transport and infrastructure portfolio of services consists of wavelength, Ethernet and colocation services. As of 2019, GTT was one of the five largest Internet backbones in terms of traffic.

30.     GTT operates a global network of over 650 points of presence ("PoPs"). The network spans six continents and provides services to clients in more than 140 countries, though the primary markets are the US and Europe. The company also operates three subsea cable systems, GTT Express, GTT North and GTT South. The company has over 3,000 employees.

31.     During the Class Period, GTT purported to be a "disruptor," seeking to grow its market share through an aggressive acquisition strategy. Since 2015, to achieve such a high rate of growth, GTT employed a "roll-up" acquisition strategy in which it acquired smaller companies in so-called "tuck-in"

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

acquisitions. Between 2008 and 2018, GTT grew rapidly, completing 30 acquisitions.

32.     According to GTT, the success of its acquisition strategy was due to the Company's unique ability to "seamlessly" and "very quickly" integrate the companies it acquired. For example, in GTT's annual report for 2017, filed on Form 10-K with the SEC on March 1, 2018 ("2017 10-K"), the Company represented that it had "completed many acquisitions throughout our history," and that it had "consistently demonstrated an ability to acquire and effectively integrate companies and realize cost synergies." Defendants routinely referred to the Company's expedited process of integration as GTT's "core competency" that was "second to none."

### Defendants Announce the Acquisition of Interoute and Assure Investors of a Smooth Integration

33.     On February 26, 2018, GTT announced it was acquiring Interoute, a European telecommunications company that operated one of Europe's largest independent fiber networks. GTT acquired Interoute for $2.3 billion. This was far and away the most important deal in the Company's history. Defendants called the acquisition "transformative," and Defendant Calder stated that it was a "a major milestone for GTT," as it would virtually double the Company in size and catapult GTT toward becoming a global market leader. Defendant Calder proclaimed that the integration would be implemented through GTT's "successful, proven acquisition model," and that GTT "expect[ed] to complete this integration within three to four quarters post-close and achieve a post-synergy multiple of seven to eight times Adjusted EBITDA or better on a pro forma basis."

34.     Interoute was easily the largest acquisition in GTT's history. Indeed, the Interoute deal was nearly four times larger than GTT's largest acquisition

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

prior to that point, and 18 times larger than the average of GTT's ten other acquisitions since 2015.

35.     Defendants repeatedly claimed that the Interoute acquisition would be seamless and that GTT would have no problem completing the integration within 3-4 quarters. For example, during the Company's March 1, 2018 earnings conference call, held just days after announcing the Interoute acquisition, Defendant Calder stated that:

> Interoute is a highly complementary platform, essentially the European version of GTT. ... Given how similar our businesses are, we are confident that we can integrate Interoute with GTT within 3 to 4 quarters....

36.     Defendants also emphasized their personal involvement in the due diligence process for the Interoute deal, and how it confirmed that Interoute could be integrated quickly. For example, on May 3, 2018, during the Company's first quarter 2018 earnings call, Calder assured investors that he had personally evaluated Interoute's strategic fit with GTT, stating that he had "spent most of the last 6 weeks traveling with [the CEO of Interoute,] meeting with employees and key customers in every major Interoute office." Calder stated that, as a result of his Interoute tour, he "came away with an even deeper level of respect and appreciation for ... the strategic fit combined with GTT."

37.     On May 31, 2018, Defendant Sicoli told investors during the Cowen CMT Conference that management was exclusively focused on the Interoute integration, stating that Defendants maintained a "really, really heavy focus" on integrating Interoute, and that it was "priority number one at this point."

38.     Market analysts took great comfort in Defendants' statements, believing that GTT would successfully implement its proven integration model with respect to Interoute as it had in connection with past transactions. For

9

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

example, a May 2, 2018 Craig-Hallum report commented: "[T]he team at GTT has had a nearly flawless [integration] record over the past several years despite a number of acquisitions across different geographies and mini-cycles." A May 3, 2018 Oppenheimer report similarly commented that, with respect to the Interoute acquisition, the "primary risk is execution … but GTT has a reputation for successfully integrating accretive acquisitions in a timely manner."

39.    Once the Interoute integration was underway, Defendants continued to reassure investors that they were personally overseeing and executing each step of the integration process. For example, during the June 12, 2018 William Blair Growth Stock Conference, Defendant Calder announced the plan for how GTT's tried and true integration strategy—"one of the core competencies of our business"—would be implemented for Interoute. Calder emphasized to investors that he had personally investigated the feasibility of this plan by "spen[ding] 8 of the last 10 weeks in Europe" at Interoute's offices, which made him "now very confident in our ability to execute [the integration]" and expected it to "probably materially be done by the fourth quarter." Calder then reassured investors that he would personally ensure the success of the plan by spending "the bulk of the remainder of this year in Europe basically executing on the integration of the two companies."

### Former GTT and Interoute Employees Describe the Interoute Integration as an Utter Disaster

40.    On July 30, 2019, investors filed a securities class action against GTT and certain of the Individual Defendants in the Eastern District of Virginia, styled *Plymouth Cnty. Ret. Sys. v. GTT Commc'ns, Inc.*, Case No. 19-cv-982 ("2019 Action"). The case was brought on behalf of a class (later certified by the court) consisting of "all persons or entities who purchased or otherwise acquired publicly traded common stock of GTT from February 26, 2018 to August 7, 2019, inclusive, and who were damaged thereby" ("2019 Action Class"). The

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

parties to the 2019 Action settled that action, including a release of claims by the 2019 Action Class, with no class members objecting to or requesting exclusion from the settlement. Final judgment was entered in the 2019 Action on April 23, 2021.

41.    The lead plaintiff in the 2019 Action filed two amended complaints in that action, the second on October 12, 2020 ("2019 Action SAC"). The 2019 Action SAC included allegations from several former GTT and Interoute employees concerning GTT's acquisition and integration of Interoute.

42.    Per the 2019 Action SAC, "CW 7," who had worked at Interoute since 2004 and served as the CEO of Interoute Italia from March 2010 to July 2018 in charge of approximately 30% of Interoute's business, explained that GTT—which had been a customer of Interoute under CW 7's management—was a "completely different business." As a result of the differences in the two companies' business models, CW 7 explained that "it was completely clear from the beginning those kinds of synergies [touted by GTT] were not reachable. They were buying something that in certain ways was completely different from what they did before."

43.    Per the 2019 Action SAC, "CW 1," who served as Interoute's Executive Vice President Service Provider through December 2016 and as a consultant to an American fund interested in purchasing Interoute in October 2017, reported that the two companies' culture, mission and strategy were "totally different." CW 1 also echoed that Interoute had a "totally different business model" from GTT's.

44.    Per the 2019 Action SAC, "CW 4," who served as Interoute's Sales Operations and Systems Training Manger in Prague from January 2006 to January 2019, confirmed that Interoute had a fundamentally different business model from GTT. CW 4 stated that Interoute's key assets were connected to its

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

huge physical network, and specifically its numerous data service centers, 70,000 kilometers of fiber network, and five undersea cables.

45.     Per the 2019 Action SAC, "CW 5," who served as Interoute's Vice President of Commercial Operations in London from January 2001 to October 2018, likewise stated that the "primary difference" between the two companies "was [Interoute] owned a lot of assets, we were very asset-heavy, and [GTT was] a virtual network operator." CW 5 stated that this resulted in very different business models, and GTT was forced "to conceptualize a lot of product lines [it] had never sold before" due to Interoute's cloud services focus.

46.     Per the 2019 Action SAC, "CW 6," who served as a Client Account Manager in GTT's New York office from January 2017 to June 2018, also recalled being surprised at rumors that GTT was buying Interoute because Interoute was so far out of GTT's usual acquisition wheelhouse, noting: "It's a completely different industry," and "unlike any of the acquisitions that were made during my time at GTT"—an overall "unnatural fit."

47.     Per the 2019 Action SAC, "CW 10," who served as a Lead Solutions Consultant for Interoute, and later for GTT, in Interoute's Geneva office from August 2010 to December 2018, similarly stated that the two companies had "very different types of markets" and "very different product sets." CW 10 therefore emphasized that the way the two companies set about their business was "completely different." As CW 10 stated, "If they had been more realistic, the impact on their shareholders would have been less, perhaps."

48.     Per the 2019 Action SAC, CW 10 also reported that Calder knew that Interoute had made a strategic shift to selling cloud services before signing the deal. According to CW 10, Defendant Calder visited Interoute's Geneva office where CW 10 worked at the tail-end of Calder's tour of Interoute's offices, shortly before GTT's announcement of the Interoute merger. According to CW

12

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

10, Calder told the Geneva office during an internal meeting that GTT had "discovered your additional [cloud] services" that Interoute had been offering "lately," and that Calder said that GTT "didn't want that business, those types of activities"—meaning that the Interoute integration would require significant efforts by GTT to cut out Interoute's cloud services business, which CW 10 said did not seem feasible "from the very first day" due to Interoute's clear focus on that business.

49.     Per the 2019 Action SAC, CW 7 explicitly warned Calder that the timelines GTT touted to investors for integrating Interoute post-merger were "absolutely ridiculous" and "unrealistic," including just prior to and at the outset of the integration. First, in February 2018, CW 7 met with Calder in person four times, where they spoke about why Calder was taking the wrong path with respect to the integration. According to CW 7: "During those conversations, he was telling me … 'we have CMD, we are going to use our CMD because it is the best way to integrate the new company' … I was trying to explain that the company is a bit more complicated than what he thought."

50.     Per the 2019 Action SAC, once the GTT-Interoute integration began, CW 7 spoke with Calder again several times over the phone. "I spoke with [Calder] four times over four months and I made my opinions clear. I told him I don't think integration can be done in a short time." CW 7 further commented that Calder was clearly "interested in doing the acquisition as fast as possible in order to start another acquisition," regardless of whether the Interoute integration was successful. CW 7's view of Calder was that he was "just trying to tell a story to the markets and for as long as the markets believe him they will give him money. But the moment will come when they will ask for the money back and this guy will disappear. This is what is happening now. The market wants its money back."

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

51.     Per the 2019 Action SAC, "CW 3," who served as a Field Engineering Manager for the Benelux and Nordics at Interoute for more than sixteen years until January 2019, also stated that the CMD timeline was completely unrealistic because Interoute relied on Seibel Tolls on a Cramer Systems platform—for which GTT had no equivalent, because unlike Interoute, GTT did not own any proprietary network before the merger. As a result, GTT had to gather a team of 60 people to build a brand new CMD to integrate both systems into one. "They developed their own CMD with 60 people to gather all the information from Siebel and Cramer," CW 3 said.

52.     Per the 2019 Action SAC, "CW 5," who served as Interoute's Vice President of Commercial Operations in London from January 2001 through October 2018, stated that it was "painfully obvious" that GTT could not possibly meet its stated integration timeline. "I met [Calder] on day one. He came in and said we will be integrated in six months. I nearly fell off my fucking chair. It was going to be easily a two-year job. Easily." CW 5 explained that much of what was on Interoute's Siebel platform was extremely complicated with some elements tailored to individual customers—none of it could easily be transferred to CMD and expected to work right away.

53.     Per the 2019 Action ASC, CW 10 explained how the integration of Interoute into GTT would be highly complex and nigh-unmanageable, certainly on GTT's stated timelines. "It was not feasible. Because of the culture of Interoute and the complexity of Interoute. [Interoute] was a collection of colonies, a collection of countries that had somehow worked together." CW 10 explained that it was impossible for everything to be migrated onto GTT's CMD platform on the timeline Calder described because so many of the contracts Interoute had with some of its largest customers (like UEFA) were so intricate. Moreover, "[t]he two systems, regardless of their internal coherence, were simply not

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

compatible. They replaced the Interoute incentive plans and the way of selling the GTT way."

54.    Per the 2019 Action SAC, "CW 13," who served as a Global Accounts Director form 2018 until January 2020 in GTT's Los Angeles, California office, stated that CMD had caused significant issues in connection with GTT's 2016 $600 million acquisition of Hibernia, its second largest acquisition after Interoute. CW 13 stated that Hibernia was never fully integrated into GTT's CMD, and "[b]ecause of this lack of integration, we couldn't issue quotes or process service orders." CW 13 stated that, ultimately, "[n]one of the services that Hibernia Media provided got integrated into GTT's CMD system," and any time CW 13 sold a Hibernia service, it was a manual service that required a lot of tweaking to the system. "We had to make our own quotes and it was very manual." CW 13 further stated that Hibernia customers suffered the same billing issues that Interoute customers would suffer after they were acquired by GTT, receiving invoices that were inexplicably higher after the acquisition. GTT lost a lot of Hibernia customers due to these issues, which took up to one year before they were resolved—causing GTT to lose millions in revenue.

55.    Per the 2019 Action SAC, "CW 2," who served as a Regional Vice President for Strategic Accounts at GTT from 2015 to December 2018, stated that the billing component of the Interoute integration was "an absolute nightmare." CW 2 reported that Interoute and GTT billing was in fact never consolidated.

56.    Per the 2019 Action SAC, "CW 4," who served as a Sales Operations Systems & Training Manager for Interoute until January 2019, stated that the impact of the acquisition on Interoute's sales operation was a disaster. CW 4 also stated that Defendant Calder had to have been aware of the integration issues, and any argument that he was ignorant of the integration problems was "nonsense." As CW 4 described, Calder's "sticky fingers were involved in every

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

single hiring and firing, all the pay increases … Everything had to be personally approved by him. He was a micromanager."

57.     Per the 2019 Action SAC, "CW 5," who served as a Interoute Vice President of Commercial Operations for Interoute through October 2018, stated that much of the fallout from the botched CMD integration was billing mistakes that infuriated customers. CW 5 stated "[w]e got threatening feedback" from some of them. For example, some customers were being told they faced losing service for non-payment of bills when in fact they had paid, while others were being billed twice for a single service.

58.     Per the 2019 Action SAC, CW 5 said Defendants Calder and Sicoli each had direct involvement in the integration execution and full knowledge of the significant issues that arose. CW 5 stated that Calder was heavily involved: "He had his fingers in everything." CW 5 reported Calder's constant presence at Interoute's offices in Europe, stating "[Calder] was really there a lot," and "would spend weeks in the Interoute office[s]. He spent a lot of time in London, also in Prague and in Sofia," with all of these visits occurring "during the integration phase." CW 5 further stated that Calder would have regular "skip meetings" at Interoute, meaning he was digging lower into its executive hierarchy and having "one to ones with a lot of people." With respect to Sicoli, CW 5 recalled having "very forthright conversations" with Sicoli in an attempt to make him understand how to make money with the very different assets GTT had acquired from Interoute—there was a lot that Interoute did that "[GTT] had never done before. I tried to go through all of that with him and get him to understand how they could make money out of it." CW 5 also recalled that there were weekly calls with Sicoli "going through all the big deals." The calls "absolutely" included discussion of the Interoute integration problems, including "around getting products into CMD—this isn't ready, that's not ready, we can't launch a wider

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

product because of this … the problems we had with CMD, how things were misaligned, how processing was incorrect."

59.    Plaintiff's own investigators also spoke with former employees of the Company who have personal knowledge of the facts alleged and attributed to them in this Complaint.

60.    Former Employee 1 ("FE1") served as a finance manager for GTT from March 2018 to September 2020, working in GTT's New York City office. FE1 worked on billing for GTT's domestic operations and for companies GTT had acquired.

61.    FE1 reported that at the time of the Interoute acquisition, Interoute was a "mess" and its "records were awful," which FE1 learned from conversations with colleagues. According to FE1, the Interoute acquisition was a "big issue" and "people were talking about how they thought Interoute was going to provide more revenue than there actually was, or there were delays in integrating those customers into GTT's billing platform." FE1's direct boss, GTT's Director of Billing Robin Berg, was so overwhelmed with the Interoute integration that FE1 and FE1's colleagues were left to fend for themselves on domestic billing issues. FE1 described the lead-up to the Interoute acquisition as frenzied.

62.    Former Employee 2 ("FE2") served as GTT's Director of Collections – Americas from January 2018 to July 2020, working out of GTT's Raleigh, NC offices.

63.    FE2 reported that, in July 2020, Defendant Ortega sent a companywide email announcement addressing accounting issues that had been identified, including that the company would have to refile financial statements due to "discrepancies" that were found. These accounting issues were then discussed during a July 2020 meeting that FE2 participated in remotely. The

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

meeting involved Director-level Finance employees and the Company's senior management, including Defendants Berns and Fraser, and the company's Vice President of Finance. According to FE2, during the July 2020 meeting, Berns and Fraser stated that the accounting issues were related primarily to GTT's acquisition of Interoute, and wound up costing GTT "a lot of money." FE2 reported that at the meeting, the executives discussed gathering information to start a comprehensive review. FE2 also participated in a few additional meetings with the same group of finance executives where these accounting issues were discussed further.

64.   According to FE2, GTT failed to conduct proper due diligence prior to the Interoute acquisition, resulting in major issues integrating Interoute into GTT's systems for "customer ERP" (enterprise resource planning), financial billing and reporting, and accounts receivables management. FE2 noted that the integration issues spanned a litany of different systems at GTT. The most problematic was integrating Interoute into GTT's Oracle system, "for the finance part of it." FE2 stated that "the systems didn't integrate properly. The infrastructure was not set up to handle that volume – our systems weren't scalable to handle that kind of volume … We are then spending a lot of GTT money for the upgrades and system enhancements to handle the scalability. It wasn't the cash cow that they thought it was going to be." FE2 also reported that GTT experienced issues with cross-currency exchange rates, given that Interoute was a Bulgarian company.

65.   FE2 knew about these issues because FE2 was in part responsible for "dealing with all the integration and the costs" that came with integrating the GTT and Interoute systems. According to FE2, "the AR [accounts receivable] management was horrible. It was a lot of work."

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

66.     FE2 stated that GTT "had never done an acquisition on that scale before. I don't think they did due diligence before the acquisition, and [they] found out it was not going to be a seamless transition and lost their rear end due to the integration of the systems, the upgrades. I don't think it was a proper due diligence of Interoute before they purchased the company."

67.     According to FE2, once the accounting issues related to the Interoute acquisition were identified, all executives and Finance employees were working to address the issues. Per FE2, "they were constantly trying to resolve the issues and work on them."

### The Company's Interoute Integration is Revealed to Be a Disaster

68.     On May 8, 2019, Defendants released GTT's financial results for the first quarter of 2019, revealing a surprising 1% sequential revenue decline— GTT's first such decline since when its "roll up" strategy began in 2015—that Defendants stated was directly attributable to "delays related to [Interoute] integration activities." Defendant Sicoli further stated that the Company's cash balance was also "negatively impacted by a significant use of working capital related to Interoute accounts receivable, as we transitioned billing and collections activity onto our CMD system."

69.     During an earnings call on May 8, 2019, Calder also admitted that the integration was negatively impacted by the fact that Interoute had made a "real shift" of its primary strategy to "selling new cloud services," what Defendants themselves had called a completely "different business" that GTT was "not trying to get into."

70.     During the earnings call, Sicoli tried to downplay the effect of Interoute's strategy shift by claiming it amounted to "roughly 5% of revenue," but he admitted that because Interoute had made a "strategic priority shift" to selling cloud services, that business was "a much higher percentage of

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

[Interoute's] sales in the year or 2 leading up to the acquisition." Sicoli stated that as a result, GTT had lost "sales momentum," and that was why "organic growth" remained "challenging" for the Company.

71. During a June 4, 2019 Credit Suisse Communications conference, Sicoli revealed that GTT had fired at least 50% of Interoute's workforce, or "about 1,000" of Interoute's employees, because those employees were involved in cloud services. Sicoli also disclosed that revenue had declined another 3% "both year-over-year and sequentially," with $12 million of the $14 million sequential reduction resulting from (i) Interoute negative net installs as a result of integration delays; and (ii) $6 million in billing credits that had to be issued to Interoute clients to resolve billing errors caused by the botched CMD migration. While Defendant Sicoli attempted to downplay the issue by stating that "[i]ssuing dispute credits as a result of billing integrations is not uncommon," he also admitted that "the magnitude is larger and the time frame is longer than we normally see." During the question and answer session on the conference call, Sicoli further stated that "[f]rom a margin perspective, the results were especially "disappointing," particularly since "[t]he revenue credits that we talked about a minute ago are essentially 100% margin reductions to revenue in period."

72. Three weeks after the August 8, 2019 earnings call, on August 27, 2019, GTT announced that Sicoli was abruptly leaving the company for a position at a company called Internap. As a BWS Financial Inc. report noted, "[t]he departure of Mr. Sicoli from GTT looks sudden with GTT depending on promoting their principal accounting officer [Fraser] to the role of interim CFO." The report further pointed out that "Mr. Sicoli's departure for a listed company with a market capitalization of less than $70 million"—compared to GTT's market cap of over $1 billion—"also draws more reason for concern."

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

73. On November 8, 2019, during the Company's third quarter earnings call, Defendants disclosed that CMD billing integration issues continued to persist unabated, causing significant revenue declines of 6% year over year and 3% sequentially while "billing credits remained elevated." Additionally, Defendants revealed that, in order to pay down the $3.2 billion in debt they had amassed from a series of acquisitions that had failed to yield sufficient returns, including Interoute, they planned to sell off Interoute's physical fiber network in Europe—the same fiber network GTT had spent $2.3 billion to acquire—as a "non-strategic asset."

**Defendants Made False and Misleading Statements of Material Fact About GTT's Financials During the Class Period**

74. On May 5, 2016, GTT filed a Form 10-Q for the first quarter of 2016, signed by Defendants Calder, Sicoli, and Fraser ("1Q16 10-Q"). Attached to the 1Q16 10-Q were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Calder and Sicoli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

75. The 1Q16 10-Q stated the following, in pertinent part, regarding GTT's internal controls:

**Evaluation of Disclosure Controls and Procedures**

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision of and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 and 15d-15 under the Exchange Act ("Disclosure Controls"). … ***The CEO***

21

*and the CFO, with assistance from other members of management, have reviewed the effectiveness of our disclosure controls and procedures as of March 31, 2016, and based on their evaluation, have concluded that the disclosure controls and procedures were effective as of such date.*

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) of the Securities Exchange Act of 1934, that occurred during the period ended March 31, 2016 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

76.     On August 8, 2016, the Company filed a Form 10-Q for the second quarter of 2016, signed by Defendants Calder, Sicoli, and Fraser ("2Q16 10-Q"). Attached to the 2Q16 10-Q were SOX certifications signed by Defendants Calder and Sicoli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

77.     The 2Q16 10-Q stated, in relevant part, the following regarding GTT's internal controls:

**Evaluation of Disclosure Controls and Procedures**

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision of and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and

22

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

procedures as defined in Rule 13a-15 and 15d-15 under the Exchange Act ("Disclosure Controls"). … ***The CEO and the CFO, with assistance from other members of management, have reviewed the effectiveness of our disclosure controls and procedures as of June 30, 2016, and based on their evaluation, have concluded that the disclosure controls and procedures were effective as of such date.***

**Changes in Internal Control over Financial Reporting**

During the three months ended June 30, 2016, we implemented a new financial accounting system. In connection with the implementation of this new system, we updated many of the processes and procedures related to our internal control over financial reporting, as needed. We do not believe the implementation of the new system or the corresponding changes in processes and procedures has had or will have a material or adverse effect on our internal control over financing reporting. Except as otherwise described above, there have been no other changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) as of June 30, 2016, that has materially affected, or is reasonably likely to materially affect our internal control over financial reporting.

(Emphasis added.)

78.     On November 9, 2016, the Company filed a Form 10-Q for the third quarter of 2016, signed by Defendants Calder, Sicoli, and Fraser ("3Q16 10-Q"). Attached to the 3Q16 10-Q were SOX certifications signed by Defendants Calder and Sicoli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

79.   The 3Q16 10-Q stated, in relevant part, the following regarding GTT's internal controls:

**Evaluation of Disclosure Controls and Procedures**

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision of and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 and 15d-15 under the Exchange Act ("Disclosure Controls"). … ***The CEO and the CFO, with assistance from other members of management, have reviewed the effectiveness of our disclosure controls and procedures as of September 30, 2016, and based on their evaluation, have concluded that the disclosure controls and procedures were effective as of such date.***

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) as of September 30, 2016, that has materially affected, or is reasonably likely to materially affect our internal control over financial reporting.

(Emphasis added.)

80.   On March 8, 2017, the Company filed an annual report for 2016 on Form 10-K, signed by Defendants Calder, Sicoli, and Fraser ("2016 10-K"). Attached to the 2016 10-K were SOX certifications signed by Defendants Calder and Sicoli attesting to the accuracy of financial reporting, the disclosure of any

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

81.     The 2016 10-K stated, in relevant part, the following regarding GTT's internal controls:

> **Management's Report on Internal Control over Financial Reporting and Attestation Report of the Registered Public Accounting Firm**
>
> … Management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria set forth in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). ***Based on the assessment, management has concluded that its internal control over financial reporting was effective as of December 31, 2016, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with U.S. GAAP.*** …
>
> **Changes in Internal Control Over Financial Reporting**
>
> During the year ended December 31, 2016, we implemented a new financial accounting system.  In connection with the implementation of this new system, we updated many of the processes and procedures related to our internal control over financial reporting, as needed. We do not believe the implementation of the new system or the corresponding changes in processes and procedures has had or will have a material or adverse effect on our internal control over financing reporting.  Except as otherwise described above, there were no other changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

ended December 31, 2016, that has materially affected, or is reasonably likely to materially affect our internal control over financial reporting.

(Emphasis added.)

82. On May 9, 2017, the Company filed a Form 10-Q for the first quarter of 2017, signed by Defendants Calder, Sicoli, and Fraser ("1Q17 10-Q"). Attached to the 1Q17 10-Q were SOX certifications signed by Defendants Calder and Sicoli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

83. The 1Q17 10-Q also stated the following, in pertinent part, regarding GTT's Cost of Telecommunications Services Provided:

**Cost of Telecommunications Services Provided**

***Cost of telecommunications services provided increased by $25.2 million, or 38.0%, from $66.2 million for the three months ended March 31, 2016 to $91.4 million for the three months ended March 31, 2017.*** Consistent with our increase in revenue, the increase in cost of telecommunications services provided was principally driven by the acquisition of Hibernia, as well as organic growth and the purchase of certain customer contracts.

(Emphasis added.)

84. In the 1Q17 10-Q, the Company reported (i) cost of telecommunications services for the quarter of $91.4 million; (ii) a net loss for the quarter of $13.1 million; and (ii) adjusted EBITDA for the quarter of $50.7 million.

85. The 1Q17 10-Q stated, in relevant part, the following regarding GTT's internal controls:

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Evaluation of Disclosure Controls and Procedures**

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision of and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 and 15d-15 under the Exchange Act ("Disclosure Controls"). … ***The CEO and the CFO, with assistance from other members of management, have reviewed the effectiveness of our disclosure controls and procedures as of March 31, 2017, and based on their evaluation, have concluded that the disclosure controls and procedures were effective as of such date.***

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) as of March 31, 2017, that has materially affected, or is reasonably likely to materially affect our internal control over financial reporting.

(Emphasis added.)

86.     On August 4, 2017, the Company filed a Form 10-Q for the second quarter of 2017, signed by Defendants Calder, Sicoli, and Fraser ("2Q17 10-Q"). Attached to the 2Q17 10-Q were SOX certifications signed by Defendants Calder and Sicoli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

87.     The 2Q17 10-Q also stated the following, in pertinent part, regarding GTT's Cost of Telecommunications Services Provided:

**Cost of Telecommunications Services Provided**

***Cost of telecommunications services provided increased by $25.1 million, or 36.8%, from $68.3 million for the three months ended June 30, 2016 to $93.4 million for the three months ended June 30, 2017.*** Consistent with our increase in revenue, the increase in cost of telecommunications services provided was principally driven by the acquisition of Hibernia, as well as rep-driven growth and the purchase of certain customer contracts.

(Emphasis added.)

88.     In the 2Q17 10-Q, the Company reported (i) cost of telecommunications services for the quarter of $93.4 million; (ii) a net loss for the quarter of $649,000; and (ii) adjusted EBITDA for the quarter of $53.8 million.

89.     The 2Q17 10-Q stated, in relevant part, the following regarding GTT's internal controls:

**Evaluation of Disclosure Controls and Procedures**

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision of and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 and 15d-15 under the Exchange Act ("Disclosure Controls"). … ***The CEO and the CFO, with assistance from other members of management, have reviewed the effectiveness of our disclosure controls and procedures as of June 30, 2017, and based on their evaluation, have concluded***

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*that the disclosure controls and procedures were effective as of such date.*

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) as of June 30, 2017, that has materially affected, or is reasonably likely to materially affect our internal control over financial reporting.

(Emphasis added.)

90.     On November 3, 2017, the Company filed a Form 10-Q for the third quarter of 2017, signed by Defendants Calder, Sicoli, and Fraser ("3Q17 10-Q"). Attached to the 3Q17 10-Q were SOX certifications signed by Defendants Calder and Sicoli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

91.     The 3Q17 10-Q also stated the following, in pertinent part, regarding GTT's Cost of Telecommunications Services Provided:

**Cost of Telecommunications Services Provided**

*Cost of telecommunications services provided increased by $31.9 million, or 46.8%, from $68.2 million for the three months ended September 30, 2016 to $100.1 million for the three months ended September 30, 2017.* Consistent with our increase in revenue, the increase in cost of telecommunications services provided was principally driven by the acquisitions of Hibernia, Perseus, and Global Capacity, as well as rep-driven growth and the purchase of certain customer contracts.

(Emphasis added.)

92.  In the 3Q17 10-Q, the Company reported (i) cost of telecommunications services for the quarter of $100.1 million; (ii) a net loss for the quarter of $9.5 million; and (ii) adjusted EBITDA for the quarter of $56.2 million.

93.  The 3Q17 10-Q stated, in relevant part, the following regarding GTT's internal controls:

**Evaluation of Disclosure Controls and Procedures**

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision of and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 and 15d-15 under the Exchange Act ("Disclosure Controls"). … ***The CEO and the CFO, with assistance from other members of management, have reviewed the effectiveness of our disclosure controls and procedures as of September 30, 2017, and based on their evaluation, have concluded that the disclosure controls and procedures were effective as of such date.***

**Changes in Internal Control over Financial Reporting**

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) as of September 30, 2017, that has materially affected, or is reasonably likely to materially affect our internal control over financial reporting.

(Emphasis added.)

---

30

94.     On March 1, 2018, the Company filed an annual report for 2017 on Form 10-K, signed by Defendants Calder, Sicoli, and Fraser ("2017 10-K"). Attached to the 2017 10-K were SOX certifications signed by Defendants Calder and Sicoli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

95.     The 2017 10-K stated, in pertinent part, the following regarding GTT's internal controls:

> **Management's Report on Internal Control over Financial Reporting and Attestation Report of the Registered Public Accounting Firm**
>
> … Management conducted an assessment of the effectiveness of our internal control over financial reporting based on the criteria set forth in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). ***Based on the assessment, management has concluded that its internal control over financial reporting was effective as of December 31, 2017, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with U.S. GAAP.*** …
>
> **Changes in Internal Control Over Financial Reporting**
>
> Except for the implementation of certain internal controls related to the adoption of the new revenue recognition standard (Topic 606), there were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the year ended December 31, 2017, that materially affected, or are reasonably likely to

31

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

materially affect, our internal control over financial reporting. …

(Emphasis added.)

96.    The 2017 10-K also stated the following, in pertinent part, regarding GTT's Cost of Telecommunications Services Provided:

**Cost of Telecommunications Services Provided**

***Cost of telecommunications services provided increased by $152.5 million, or 54.5%, from $279.6 million for the year ended December 31, 2016 to $432.1 million for the year ended December 31, 2017.*** Consistent with our increase in revenue, the increase in cost of telecommunications services provided was principally driven by 2017 Acquisitions and the purchase of certain customer contracts.

(Emphasis added.)

97.    The 2017 10-K also reported that (i) GTT's cost of telecommunications services for the fourth quarter of 2017 was $136.0 million, and $432.1 million for the full year; (ii) GTT's net loss for the fourth quarter of 2017 was $49.5 million, and $71.5 million for the full year; and (iii) GTT's adjusted EBITDA for 2017 was $221.7 million.

98.    In the 2017 10-K, GTT reported a goodwill balance of $644.5 million at year end. Defendants also disclosed the following goodwill adjustments:

| | | |
|---|---|---:|
| **Goodwill - January 1, 2016** | $ | 271.0 |
| Initial goodwill associated with 2016 business combinations | | 5.1 |
| Adjustments to prior year business combinations | | 4.5 |
| **Goodwill - December 31, 2016** | | 280.6 |
| Initial goodwill associated with 2017 business combinations | | 334.7 |
| Adjustments to current year business combinations | | 28.9 |
| Adjustments to prior year business combinations | | 0.3 |
| **Goodwill - December 31, 2017** | $ | 644.5 |

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

99.   On November 3, 2017, the Company filed a Form 10-Q for the first quarter of 2018, signed by Defendants Calder, Sicoli, and Fraser ("1Q18 10-Q"). Attached to the 1Q18 10-Q were SOX certifications signed by Defendants Calder and Sicoli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

100.   The 1Q18 10-Q also stated the following, in pertinent part, regarding GTT's Cost of Telecommunications Services Provided:

**Cost of Telecommunications Services Provided**

***Cost of telecommunications services provided increased by $46.5 million, or 48.9%, from $95.0 million for the three months ended March 31, 2017 to $141.5 million for the three months ended March 31, 2018.*** Consistent with our increase in revenue, the increase in cost of telecommunications services provided was principally driven by having the full quarter impact of the 2017 Acquisitions, and the acquisition of ACI.

(Emphasis added.)

101.   In the 1Q18 10-Q, the Company reported (i) cost of telecommunications services for the quarter of $141.5 million; (ii) a net loss for the quarter of $30.7 million; and (ii) adjusted EBITDA for the quarter of $62.7 million.

102.   The 1Q18 10-Q stated, in relevant part, the following regarding GTT's internal controls:

**Evaluation of Disclosure Controls and Procedures**

… Management, with the participation of our Chief Executive Officer, and our Chief Financial Officer,

33

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

evaluated the effectiveness of the Company's disclosure controls and procedures as of March 31, 2018. ***Based on this evaluation, the Company's Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were not effective, as of March 31, 2018, due to the material weakness over internal control over financial reporting described below***, in providing reasonable assurance that the information required to be disclosed by us in this report was accumulated and communicated in the manner provided above.

\* \* \*

*Material Weakness in Internal Control Over Financial Reporting*

The Company's management, including our Chief Executive Officer and Chief Financial Officer, identified a material weakness in the Company's internal control over financial reporting. …

The Company's operating effectiveness of controls over accounting for complex and unusual transactions failed to operate during the quarter ended March 31, 2018. The Company failed to correctly account for a deal-contingent foreign currency hedge as a derivative. This derivative was entered into during the quarter ended March 31, 2018, in which we entered into the Agreement for Sale and Purchase of Interoute, and the derivative will be settled at the closing of the Interoute acquisition, which is expected to occur during the second quarter of 2018. The Company's auditors identified an adjustment subsequent to the initial assessment of the Company's management, which has been correctly recorded in the condensed consolidated financial statements as of and for the three months ended March 31, 2018 presented herein. This material weakness could result in a failure to correctly account

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

for complex and unusual transactions that could result in a material misstatement to the consolidated financial statements that would not be prevented or detected.

*Remediation Measures*

To address the material weakness described above, the Company has designed and is in the process of implementing new and enhanced controls to ensure that complex and unusual transactions are accounted for correctly and that in-house accounting personnel have training to ensure they have the relevant expertise related to complex and unusual transactions, including derivative contracts.

***We believe the actions described above will be sufficient to remediate the identified material weakness and strengthen our internal control over financial reporting.*** We expect that the enhanced controls will be implemented during the second quarter of 2018 and anticipate being able to fully remediate the material weakness no later than December 31, 2018. We will continue to monitor the effectiveness of these controls and will make any further changes management determines appropriate.

**Changes in Internal Control over Financial Reporting**

Except for (i) the Company's identification and assessment of the material weakness described above during the quarter ended March 31, 2018 and (ii) the implementation of certain controls related to the adoption of the new revenue recognition standard (Topic 606), there were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) as of March 31, 2018, that have materially affected, or are reasonably

35

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

likely to materially affect our internal control over financial reporting.

(Emphasis added.)

103.   On August 8, 2018, the Company filed a Form 10-Q for the second quarter of 2018, signed by Defendants Calder, Sicoli, and Fraser ("2Q18 10-Q"). Attached to the 2Q18 10-Q were SOX certifications signed by Defendants Calder and Sicoli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

104.   The 2Q18 10-Q also stated the following, in pertinent part, regarding GTT's Cost of Telecommunications Services Provided:

**Cost of Telecommunications Services Provided**

***Cost of telecommunications services provided increased by $82.1 million, or 84.4%, from $97.3 million for the three months ended June 30, 2017 to $179.4 million for the three months ended June 30, 2018.*** Consistent with our increase in revenue, the increase in cost of telecommunications services provided was principally driven by the 2017 Acquisitions [the 2017 acquisitions of Global Capacity, Transbeam, and Custom Connect], and the 2018 Acquisitions [the 2018 acquisitions of ACI and Interoute.]

(Emphasis added.)

105.   In the 2Q18 10-Q, the Company reported (i) cost of telecommunications services for the quarter of $179.4 million; (ii) a net loss for the quarter of $136.3 million; and (ii) adjusted EBITDA for the quarter of $74.9 million.

106.   In the 2Q18 10-Q, GTT reported a goodwill balance of $1.779 billion

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

at the quarter's end and attributed $1.079 billion of goodwill specifically to Interoute as of the May 31, 2018 acquisition date. Defendants further represented that the "additions to both goodwill and intangible assets during the six months ended June 30, 2018 relate primarily to the acquisition of ACI and Interoute," and disclosed the following goodwill adjustments:

| | | |
|---|---|---|
| **Goodwill - December 31, 2017** | $ | 644.5 |
| Initial goodwill associated with 2018 business combinations | | 1,107.3 |
| Adjustments to 2018 business combinations | | 2.4 |
| Adjustments to prior year business combinations | | 24.8 |
| **Goodwill - June 30, 2018** | $ | 1,779.0 |

107.   On November 8, 2018, the Company filed a Form 10-Q for the third quarter of 2018, signed by Defendants Calder, Sicoli, and Fraser ("3Q18 10-Q"). Attached to the 3Q18 10-Q were SOX certifications signed by Defendants Calder and Sicoli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

108.   The 3Q18 10-Q also stated the following, in pertinent part, regarding GTT's Cost of Telecommunications Services Provided:

### Cost of Telecommunications Services Provided

***Cost of telecommunications services provided increased by $143.6 million, or 138.3%, from $103.8 million for the three months ended September 30, 2017 to $247.4 million for the three months ended September 30, 2018.*** Consistent with our increase in revenue, the increase in cost of telecommunications services provided was principally driven by the 2017 Acquisitions [the 2017 acquisitions of Global Capacity, Transbeam, and Custom Connect], and the 2018

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Acquisitions [the 2018 acquisitions of ACI and Interoute.]

(Emphasis added.)

109. In the 3Q18 10-Q, the Company reported (i) cost of telecommunications services for the quarter of $247.4 million; (ii) a net loss for the quarter of $23.4 million; and (ii) adjusted EBITDA for the quarter of $108.4 million.

110. In the 3Q18 10-Q, GTT reported a goodwill balance of $1.6668 billion at the quarter's end and attributed $980.1 million of goodwill specifically to Interoute as of the May 31, 2018 acquisition date. Defendants further represented that the "additions to both goodwill and intangible assets during the nine months ended June 30, 2018 relate primarily to the acquisition of ACI and Interoute," and disclosed the following goodwill adjustments:

| | | |
|---|---|---|
| **Goodwill - December 31, 2017** | $ | 644.5 |
| Initial goodwill associated with 2018 business combinations | | 1,107.3 |
| Adjustments to 2018 business combinations | | (100.0) |
| Adjustments to prior year business combinations | | 23.5 |
| Foreign currency translation adjustments | | (8.5) |
| **Goodwill - September 30, 2018** | $ | 1,666.8 |

111. On March 1, 2019, the Company filed an annual report for 2018 on Form 10-K, signed by Defendants Calder, Sicoli, and Fraser ("2018 10-K"). Attached to the 2018 10-K were SOX certifications signed by Defendants Calder and Sicoli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

112. The 2018 10-K stated, in pertinent part, the following regarding GTT's internal controls:

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

**Management's Report on Internal Control over Financial Reporting and Audit Report of the Registered Public Accounting Firm**

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). *Management conducted an assessment of the effectiveness of our internal control over financial reporting* based on the criteria set forth in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013). *Based on the assessment, management has concluded that its internal control over financial reporting was effective as of December 31, 2018, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with U.S. GAAP.* The effectiveness of our internal control over financial reporting as of December 31, 2018, has been audited by CohnReznick LLP, an independent registered public accounting firm, as stated in their report, which appears herein.

**Changes in Internal Control Over Financial Reporting**

*Except for the 1) Company's design and implementation of new and enhanced controls to remediate the material weakness described above, and 2) the implementation of certain internal controls related to the adoption of the new leasing standard (Topic 842), there were no changes in our internal control over financial reporting* (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) *during the three months ended December 31, 2018, that materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.* The Company implemented new controls as

39

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

part of its effort to adopt Topic 842. The adoption of Topic 842 required the implementation of new accounting processes, which changed the Company's internal controls over lease accounting. We implemented these internal controls to ensure we adequately evaluated our leases and properly assessed the impact of Topic 842 on our financial statements to facilitate its adoption in 2019.

(Emphasis added.)

113. The 2018 10-K also stated, in relevant part, the following regarding GTT's Cost of Telecommunications Services:

**Cost of Telecommunications Services**

***Cost of telecommunications services increased by $387.3 million, or 89.6%, from $432.1 million for the year ended December 31, 2017 to $819.4 million for the year ended December 31, 2018.*** Recurring cost of telecommunications services was approximately 94% and 95% of total cost of telecommunications services for the year ended December 31, 2018 and 2017, respectively. Consistent with our increase in revenue, the increase in cost of telecommunications services was principally driven by the 2017 Acquisitions [the 2017 acquisitions of Custom Connect, Transbeam, Global Capacity, Perseus, and Hibernia], and the 2018 Acquisitions [the 2018 acquisitions of Access Point, Interoute, and Accelerated Connections]

(Emphasis added.)

114. The 2018 10-K also reported that (i) GTT's cost of telecommunications services for the fourth quarter of 2018 was $251.2 million, and $819.4 million for the full year; (ii) GTT's net loss for the fourth quarter of 2018 was $53.0 million, and $243.4 million for the full year; and (iii) GTT's

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

adjusted EBITDA for the fourth quarter was $117.2 million, and $363.1 million for the full year.

115.   In the 2018 10-K, GTT reported a goodwill balance of $1.738 billion at year end and attributed $1.040 billion of goodwill specifically to Interoute as of the May 31, 2018 acquisition date. Defendants also disclosed the following goodwill adjustments:

| | | |
|---|---|---|
| **Goodwill - December 31, 2016** | $ | 280.6 |
| Initial goodwill associated with 2017 business combinations | | 334.7 |
| Adjustments to 2017 business combinations | | 28.9 |
| Adjustments to prior year business combinations | | 0.3 |
| **Goodwill - December 31, 2017** | | 644.5 |
| Initial goodwill associated with 2018 business combinations | | 1,130.9 |
| Adjustments to 2018 business combinations | | (37.9) |
| Adjustments to prior year business combinations | | 22.2 |
| Foreign currency translation adjustments | | (21.7) |
| **Goodwill - December 31, 2018** | $ | 1,738.0 |

116.   On May 10, 2019, the Company filed a Form 10-Q for the first quarter of 2019, signed by Defendants Calder, Sicoli, and Fraser ("1Q19 10-Q"). Attached to the 1Q19 10-Q were SOX certifications signed by Defendants Calder and Sicoli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

117.   The 1Q19 10-Q also stated the following, in pertinent part, regarding GTT's Cost of Telecommunications Services Provided:

**Cost of Telecommunications Services Provided**

***Cost of telecommunications services provided increased by $100.3 million, or 70.9%, from $141.5 million for the three months ended March 31, 2018 to $241.8 million for the three months ended March 31, 2019. Recurring cost of telecommunications services***

41

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

> *was approximately 94% and 90% of total cost of telecommunications services for the three months ended March 31, 2019 and 2018, respectively.* Consistent with our increase in revenue, the increase in cost of telecommunications services provided was principally driven by the 2018 Acquisitions [the 2018 acquisitions of Accelerated Connections Inc., Interoute, and Access Point, Inc.].

(Emphasis added.)

118.   In the 1Q19 10-Q, the Company reported (i) cost of telecommunications services for the quarter of $241.8 million; (ii) a net loss for the quarter of $27.3 million; and (ii) adjusted EBITDA for the quarter of $122.2 million.

119.   The 1Q19 10-Q stated, in relevant part, the following regarding GTT's internal controls:

**Evaluation of Disclosure Controls and Procedures**

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision of and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 and 15d-15 under the Exchange Act ("Disclosure Controls"). … *The CEO and the CFO, with assistance from other members of management, have reviewed the effectiveness of our disclosure controls and procedures as of March 31, 2019, and based on their evaluation, have concluded that the disclosure controls and procedures were effective as of such date.*

**Changes in Internal Control over Financial Reporting**

42

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

> Except for the Company's design and implementation of certain controls related to the adoption of the new leases standard (ASC 842), there were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) as of March 31, 2019, that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting.

(Emphasis added.)

120.    On August 8, 2019, the Company filed a Form 10-Q for the second quarter of 2019, signed by Defendants Calder, Sicoli, and Fraser ("2Q19 10-Q"). Attached to the 2Q19 10-Q were SOX certifications signed by Defendants Calder and Sicoli attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

121.    The 2Q19 10-Q also stated the following, in pertinent part, regarding GTT's Cost of Telecommunications Services Provided:

**Cost of Telecommunications Services Provided**

***Cost of telecommunications services provided increased by $58.1 million, or 32.4%, from $179.4 million for the three months ended June 30, 2018 to $237.5 million for the three months ended June 30, 2019. Recurring cost of telecommunications services was approximately 92% and 91% of total cost of telecommunications services for the three months ended June 30, 2019 and 2018, respectively.*** Consistent with our increase in revenue, the increase in cost of telecommunications services provided was principally driven by the 2018 Acquisitions [the 2018 acquisitions of Accelerated Connections Inc., Interoute, and Access Point, Inc.].

(Emphasis added.)

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

122.    In the 2Q19 10-Q, the Company reported (i) cost of telecommunications services for the quarter of $237.5 million; (ii) a net loss for the quarter of $33.3 million; and (ii) adjusted EBITDA for the quarter of $112.0 million.

123.    The 2Q19 10-Q stated, in relevant part, the following regarding GTT's internal controls:

**Evaluation of Disclosure Controls and Procedures**

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision of and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 and 15d-15 under the Exchange Act ("Disclosure Controls"). … ***The CEO and the CFO, with assistance from other members of management, have reviewed the effectiveness of our disclosure controls and procedures as of June 30, 2019, and based on their evaluation, have concluded that the disclosure controls and procedures were effective as of such date.***

**Changes in Internal Control over Financial Reporting**

Except for the Company's design and implementation of certain controls related to the adoption of the new leases standard (ASC 842), there were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) as of June 30, 2019, that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting.

(Emphasis added.)

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

124.    On November 12, 2019, the Company filed a Form 10-Q for the third quarter of 2019, signed by Defendants Calder and Fraser ("3Q19 10-Q"). Attached to the 3Q19 10-Q were SOX certifications signed by Defendants Calder and Fraser attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

125.    The 3Q19 10-Q also stated the following, in pertinent part, regarding GTT's Cost of Telecommunications Services Provided:

**Cost of Telecommunications Services Provided**

***Cost of telecommunications services provided decreased by $14.6 million, or 5.9%, from $247.4 million for the three months ended September 30, 2018 to $232.8 million for the three months ended September 30, 2019.*** Recurring cost of telecommunications services was approximately 93% and 92% of total cost of telecommunications services for the three months ended September 30, 2019 and 2018, respectively. Consistent with our decrease in revenue, the decrease in cost of telecommunications services provided was principally driven by a corresponding reduction in costs related to negative net installs, cost synergies realized in 2019 after the integration of Interoute, and the effects of fluctuating foreign currency exchange rates.

(Emphasis added.)

126.    In the 3Q19 10-Q, the Company reported (i) cost of telecommunications services for the quarter of $232.8 million; (ii) a net loss for the quarter of $26.2 million; and (ii) adjusted EBITDA for the quarter of $102.4 million.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

127.   The 3Q19 10-Q stated, in relevant part, the following regarding GTT's internal controls:

**Evaluation of Disclosure Controls and Procedures**

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision of and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 and 15d-15 under the Exchange Act ("Disclosure Controls").  … ***The CEO and the CFO, with assistance from other members of management, have reviewed the effectiveness of our disclosure controls and procedures as of September 30, 2019, and based on their evaluation, have concluded that the disclosure controls and procedures were effective as of such date.***

**Changes in Internal Control over Financial Reporting**

Except for the Company's design and implementation of certain controls related to the adoption of the new leases standard (ASC 842), there were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) as of September 30, 2019, that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting.

(Emphasis added.)

128.   On March 2, 2020, the Company filed an annual report for 2019 on Form 10-K ("2019 10-K").  Attached to the 2019 10-K were SOX certifications signed by Defendants Calder and Fraser attesting to the accuracy of financial

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

129. The 2019 10-K stated the following, in relevant part, about GTT's internal controls:

### Management's Annual Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). ***Management conducted an assessment of the effectiveness of our internal control over financial reporting*** based on the criteria set forth in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. ***Based on the assessment, management has concluded that our internal control over financial reporting was effective as of December 31, 2019, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements in accordance with U.S. GAAP.*** The effectiveness of our internal control over financial reporting as of December 31, 2019, has been audited by CohnReznick LLP, an independent registered public accounting firm, as stated in its report, which appears herein.

### Changes in Internal Control Over Financial Reporting

***Except for the Company's design and implementation of certain controls related to the adoption of the new leases standard (ASC 842), there were no changes in our internal control over financial reporting*** (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) ***during the year ended December 31, 2019, that have materially affected, or are reasonably***

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

***likely to materially affect our internal control over financial reporting.*** The Company implemented new controls as part of its effort to adopt Topic 842. The adoption of Topic 842 required the implementation of new accounting processes, which changed the Company's internal controls over lease accounting. We implemented these internal controls to ensure we adequately evaluated our leases and properly assessed the impact of Topic 842 on our financial statements to facilitate its adoption in 2019.

(Emphasis added.)

130.   The 2019 10-K stated the following, in pertinent part, about GTT's Cost of Telecommunications Services:

**Cost of Telecommunications Services**

***Cost of telecommunications services increased by $122.5 million, or 14.9%, from $819.4 million for the year ended December 31, 2018 to $941.9 million for the year ended December 31, 2019.*** Recurring cost of telecommunications services was approximately 93% and 94% of total cost of telecommunications services for the years ended December 31, 2019 and 2018, respectively. Consistent with our increase in revenue, the increase in cost of telecommunications services was principally driven by the 2018 Acquisitions [the 2018 acquisitions of Access Point, Interoute, and Accelerated Connections].

(Emphasis added.)

131.   The 2019 10-K also reported that (i) GTT's cost of telecommunications services for the fourth quarter of 2018 was $241.8 million, and $941.9 million for the full year; (ii) GTT's net loss for the fourth quarter of 2018 was $27.3 million, and $105.9 million for the full year; and (iii) GTT's adjusted EBITDA for the year of $439.3 million.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

132.   On May 8, 2020, the Company filed a Form 10-Q for the first quarter of 2020, signed by Defendants Calder, Berns, and Fraser ("1Q20 10-Q"). Attached to the 1Q20 10-Q were SOX certifications signed by Defendants Calder and Berns attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

133.   The 1Q20 10-Q also stated the following, in pertinent part, regarding GTT's Cost of Telecommunications Services Provided:

**Cost of Telecommunications Services Provided**

***Cost of telecommunications services provided decreased by $4.1 million, or 1.7%, from $241.8 million for the three months ended March 31, 2019 to $237.7 million for the three months ended March 31, 2020. Recurring cost of telecommunications services was approximately 92% and 94% of total cost of telecommunications services for the three months ended March 31, 2020 and 2019, respectively.*** Consistent with our decrease in revenue, the decrease in cost of telecommunications services provided was principally driven by a corresponding reduction in costs related to negative net installs, cost synergies realized in 2020, and the effects of fluctuating foreign currency exchange rates, partially offset by an increase in cost of telecommunications services from KPN.

(Emphasis added.)

134.   In the 1Q20 10-Q, the Company reported (i) cost of telecommunications services for the quarter of $237.7 million; (ii) a net loss for the quarter of $83.3 million; and (ii) adjusted EBITDA for the quarter of $89.3 million.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

135.   The 1Q20 10-Q stated, in relevant part, the following regarding GTT's internal controls:

### Evaluation of Disclosure Controls and Procedures

Our management carried out an evaluation required by Rule 13a-15 under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), under the supervision of and with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), of the effectiveness of our disclosure controls and procedures as defined in Rule 13a-15 and 15d-15 under the Exchange Act ("Disclosure Controls"). … ***The CEO and the CFO, with assistance from other members of management, have reviewed the effectiveness of our disclosure controls and procedures as of March 31, 2020, and based on their evaluation, have concluded that the disclosure controls and procedures were effective as of such date.***

### Changes in Internal Control over Financial Reporting

There were no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) as of March 31, 2020, that have materially affected, or are reasonably likely to materially affect our internal control over financial reporting.

(Emphasis added.)

136.   The above statements in ¶¶ 74-135 were materially false and misleading because Defendants failed to disclose that the Company's senior executives fraudulently manipulated the financial results reported during the Class Period by improperly concealing and underreporting expenses GTT incurred and artificially inflating goodwill balances attributed to companies acquired by GTT,

including Interoute. These fraudulent accounting manipulations in turn caused GTT to (i) overstate its reporting of net operating income or losses and adjusted EBITDA; and (ii) understate expenses, including Cost of Telecommunications Services. These statements were also materially false and misleading because Defendants failed to disclose that (1) there were material weaknesses in the Company's internal controls related to the recording and reporting of Cost of Telecommunications Services, goodwill, bad debt, reserves for credits to be issued to customers, and additional accounting manipulations not yet identified including, among other things, the accounting for certain intercompany transactions during 2016-2019; and (2) inadequate internal controls created undisclosed material risks that the Company would experience extensive delays in filing its quarterly and annual reports, resulting in the Company defaulting on its notes and credit agreements, entering various forbearance agreements, and, ultimately, in the Company's delisting from the NYSE.

**GTT Gradually Reveals the Truth Concerning**
**Its Inadequate Internal Controls and False Financial Statements**

137.   On May 26, 2020, the Company filed a current report with the SEC on Form 8-K announcing that Defendant Calder was "remov[ed] from his position as the Company's Chief Executive Officer and President." GTT did not provide any further details concerning Calder's termination. Defendant Ortega was named interim CEO on July 1.

138.   On August 10, 2020, GTT was due to file its quarterly report for the second quarter of 2020 with the SEC on Form 10-Q. Instead, after market hours, GTT filed a Form NT 10-Q notification of inability to timely file its Form 10-Q for the quarter ("2Q NT 10-Q").

139.   The 2Q NT 10-Q stated, in relevant part, the following regarding the delay in the quarterly report:

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

GTT Communications, Inc. (the "Company") is unable to file its Quarterly Report on Form 10-Q for the quarter ended June 30, 2020 (the "Form 10-Q") within the prescribed time period without unreasonable effort or expense. ***In the course of closing the Company's books for the quarter ended June 30, 2020, the Company identified certain issues related to the recording and reporting of Cost of Telecommunications Services and related internal controls.***

Upon identifying these issues, the Company informed the Audit Committee of the Board of Directors (the "Audit Committee") and CohnReznick LLP, the Company's independent registered public accounting firm (the "Independent Auditor"). ***The Company's management and the Audit Committee, with assistance from outside counsel and consultants, are reviewing (the "Review") these issues and assessing the effect, if any, on the Company's financial statements for the quarter ended June 30, 2020 and previously issued financial statements, as well as whether there are any material weaknesses in the Company's internal controls.***

At this time, the Company does not know whether the Review will identify any issues other than those described above. Although the Company plans to file the Form 10-Q as soon as possible after the completion of the Review, the Company does not anticipate filing the Form 10-Q on or before August 17, 2020, the extended period provided for the filing under Rule 12b-25(b) of the Securities Exchange Act of 1934, as amended. The Company is unable to predict a specific filing date at this time due to the early stage of the Review.

(Emphasis added.)

140.   GTT's 2019 10-K defined Cost of Telecommunications Services as "direct costs incurred in accessing other telecommunications providers' networks

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

in order to maintain the Company's Tier 1 IP network and provide telecommunication services to the Company's clients, including access, colocation, usage-based charges, and certain excise taxes and surcharges recorded on a gross basis." These costs represented by far the Company's largest category of operating expense.

141. GTT's 2019 10-K explained that "Cost of Telecommunications Services" was "principally driven" by the Company's "2018 Acquisitions," of which the largest and most significant by far was Interoute. In fact, GTT's other acquisitions in 2018, Accelerated Connections, Inc. and Access Point, Inc., were each approximately 50 times smaller than the Interoute acquisition.

142. On August 10, 2020, after the close of markets, GTT also filed a current report with the SEC on Form 8-K. In the August 10, 2020 8-K, GTT also disclosed that it had amended the terms of the credit agreement the Company had entered into on May 31, 2018 in order to acquire Interoute. Under the amended credit agreement the associated creditors agreed to extend GTT's deadline for curing its delayed SEC filing until October 30, 2020. If GTT failed to file its 10-Q by this deadline, the Company could be deemed in default of the credit agreement, at which point GTT's remaining debt balance would become immediately due and payable.

143. Several analysts also expressed serious concerns with these revelations, particularly in light of the fact that GTT had abruptly terminated Defendant Calder less than three months prior without providing any explanation for his departure. For instance, on August 11, 2020, a Raymond James analyst report stated that GTT's newly-disclosed accounting problems must have provided "further reason for the CEO change in May" and that, "fortunately for current shareholders, the management team responsible for these issues is no longer with the company." Similarly, on August 11, 2020, Truist reiterated its

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

prior downgrade of GTT, particularly considering "the resignation of [Calder] in late May that followed [Sicoli's resignation] in 2H19," as well as the financial reporting "that is now being questioned." Analysts also emphasized the magnitude of the accounting manipulation. For instance, on August 11, 2020, Craig-Hallum suspended its "estimates, rating and price target until the company is able to file results and there is no restatement potential," warning that the filing delay could "take well longer than anticipated and can be very costly and disruptive[.]" On this same day, Raymond James echoed this pessimism, stating that "we lack confidence in the integrity of reported numbers and/or reinstated numbers, and expect the current and prior periods to change."

144. On this news, GTT shares fell by $0.65, or over 11%, from closing at $5.61 on August 10, 2020 to close at $4.96 on August 11, 2020.

145. On August 19, 2020, GTT filed a Form 8-K stating that it had received a notice from the NYSE advising the Company that it was "not in compliance with the NYSE's continued listing requirements" due to the Company's failure to timely file its second quarter 2020 10-Q; that GTT could be delisted if it did not file the 10-Q by the end of the cure period on February 17, 2021; and that the NYSE could commence delisting proceedings earlier "if circumstances warrant."

146. On September 15, 2020, GTT announced a "mutual agreement" that Fraser would leave the Company. Fraser was the Company's interim CFO from September 2019 through April 6, 2020, and was then serving as the Senior Vice President and Corporate Controller of the Company and GTT's principal accounting officer.

147. That same day, the Company also announced more detail concerning the scope of the ongoing review of the accounting issues identified the prior month. Specifically, GTT filed a current report with the SEC on Form 8-K

disclosing that the review had "identified a number of issues in connection with the Company's previously issued financial statements," including issues that impacted the Company's financial reports during the 2019 Action's class period. GTT revealed that the review had determined that the Company had made "adjustments ... without adequate support to Cost of Telecommunications Services" that had "the effect of removing expenses from the Company's income statement at quarter-end and then recognizing certain of those expenses in subsequent quarters."

148.   The Company also disclosed in the September 15, 2020 8-K that in 2017 and 2018, GTT failed "to recognize certain expenses on the Company's income statement by recording such expenses to goodwill and thereby attributing such expenses to pre-acquisition accruals, without adequate support, for companies that had been acquired." In GTT's quarterly report for the second quarter of 2018, filed with the SEC on Form 10-Q on August 8, 2018, Defendants defined "goodwill" as "the excess of the purchase price [of an acquired company] over the fair value of the net identifiable assets acquired in a business combination."

149.   The September 15, 2020 8-K also stated that GTT was "reassessing its previous conclusions regarding the effectiveness of its internal control over financial reporting" during each of the quarters from 2017 through the first quarter of 2020 and that the Company expected "to identify material weaknesses in the Company's internal control over financial reporting." GTT also specifically noted that the Company's internal review was continuing, and that there could be no assurance that additional fraudulent accounting would not be identified. Among other things, the Company disclosed that it was examining "certain intercompany transactions" that had been recorded from 2016 through 2019.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

150.   Finally, GTT disclosed in the September 15, 2020 8-K that it had received a notice of default stemming from its failure to file its 2Q20 10-Q, this time from holders of at least 25% of GTT's 7.875% Senior Notes due 2024. If the Company did not file its delayed 10-Q by November 1, 2020, GTT would be in default on its notes, in addition to the credit agreement. In this event, the remaining balances under the credit agreement and the notes could become immediately due and owed, meaning GTT could become obligated to immediately repay a substantial portion of its more than $3 billion of debt. GTT acknowledged that due to its admitted accounting and internal control issues there was a "substantial possibility" that it would not be able to comply with the October 30 or November 1, 2020 cure of default deadlines.

151.   The accounting manipulations revealed in the September 15, 2020 8-K were clearly related to the Interoute acquisition and integration. GTT's own SEC filings disclosed that the improper end-of-quarter "adjustments" to expenses related to Cost of Telecommunications Services were "principally driven" by GTT's acquisition of Interoute. Similarly, GTT's failure to recognize other expenses by recording them as goodwill "for companies that had been acquired" likewise related directly to Interoute, as it was by far the largest "compan[y] that had been acquired" during the relevant timeframe. Moreover, in GTT's quarterly reports for the second and third quarters of 2018, the Company explicitly represented that the "additions to both goodwill and intangible assets during [these periods] relate primarily to the acquisition of ACI and Interoute."

152.   Analysts reacted negatively to these disclosures. On September 16, 2020, Morningstar concluded that GTT would likely default on its debt obligations such that "a substantial portion of its more than $3 billion in debt will come due." Because of this, Morningstar stated, "the firm is in disarray" and warned that bankruptcy "remains a distinct threat." On September 16, 2020,

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Raymond James noted that the termination of GTT's principal accounting officer, Fraser, was related to "accounting control issues leading to what are now being characterized as material deficiencies delaying the 2Q20 10-Q filing and a subsequent need to restate several years of reported results."

153.   On October 28, 2020, GTT filed a current report with the SEC on Form 8-K that revealed additional information demonstrating the severity and extent of Defendants' accounting fraud. Not only was the Company still unable to file its already-delayed 2Q20 10-Q, but it also did not expect to be able to timely file its third quarter 10-Q, which would render GTT in default under its credit agreements and an indenture, and in continued violation of the NYSE's listing rules. Specifically, the October 28, 2020 8-K stated that:

> The Company does not expect to be able to file the Late [Q2] SEC Report or the Q3 SEC Report by the applicable deadlines under the Indenture and Credit Agreement or by the Expiration Time under the Forbearance Agreements, as a result of the Company's previously disclosed review of certain issues related to the recording and reporting of Cost of Telecommunications Services, certain intercompany transactions and related internal controls (the "Review"), which is continuing. The Company is unable to predict specific filing dates for the Late [Q2] SEC Report and Q3 SEC Report at this time.

154.   On November 9, 2020, GTT filed with the SEC a Form NT 10-Q notification of inability to timely file Form 10-Q for the third quarter of 2020 ("3Q NT 10-Q").  The 3Q NT 10-Q stated, in relevant part, the following regarding the delay in the quarterly report:

> As reported by the Company in its prior filings with the Securities and Exchange Commission (the "SEC"), *in the course of closing the Company's books for the*

57

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

*quarter ended June 30, 2020, the Company identified certain issues related to the recording and reporting of Cost of Telecommunications Services and related internal controls.* The Company's management and the Audit Committee (the "Audit Committee") of the Company's Board of Directors (the "Board"), with assistance from outside counsel and consultants, commenced a review (the "Review") with respect to these issues and are assessing the effect, if any, on the Company's unissued and previously issued financial statements, as well as whether there are any material weaknesses in the Company's internal controls.

In addition, as previously disclosed, *the Review is examining the accounting for Cost of Telecommunications Services and has identified a number of issues in connection with the Company's previously issued financial statements*, including: *(i) adjustments made without adequate support to Cost of Telecommunications Services during the year ended December 31, 2019 and the three months ended March 31, 2020* that had the effect of removing expenses from the Company's income statement at quarter-end and then recognizing certain of those expenses in subsequent quarters; and *(ii) failures during the years ended December 31, 2018 and 2017 to recognize certain expenses on the Company's income statement by recording such expenses to goodwill* and thereby attributing such expenses to pre-acquisition accruals, without adequate support, for companies that had been acquired. In addition, *the Review is also examining: (x) certain intercompany transactions recorded during the years ended December 31, 2019, 2018, 2017 and 2016, and each of the quarters during the years ended December 31, 2019, 2018, 2017 and 2016*; (y) accounting for bad debt expense during the year ended December 31, 2019; and (z) accounting for credits issued to customers during the years ended December

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

31, 2019 and 2018 and the three months ended March 31, 2020.

Furthermore, as disclosed in prior filings with the SEC, *the Company is also reassessing its previous conclusions regarding the effectiveness of its internal control over financial reporting.* At the conclusion of the Review, the Company expects the Review to identify material weaknesses in the Company's internal control over financial reporting, and the Company intends to continue to evaluate and implement remedial measures to address any such material weaknesses.

At this time, the Company has not concluded its Review and there is no assurance that additional items will not be identified. *The Company's management and the Audit Committee, with assistance from outside counsel and consultants, are continuing to assess the effect of the matters described above on the Company's financial statements for the years ended December 31, 2019, 2018, 2017 and 2016*, *each of the quarters during the years ended December 31, 2019, 2018, 2017 and 2016 and the quarter ended March 31, 2020*. As of the date of filing this Form 12b-25, the Company is unable to estimate the total potential impact of the issues described herein on its previously issued financial statements.

(Emphasis added.)

155.  On December 8, 2020, after the close of trading, GTT filed a current report with the SEC on Form 8-K, which disclosed Defendant Berns' abrupt departure from the Company. Berns was the Company's CFO and interim principal accounting officer after Defendant Fraser's departure. Berns' departure marked the last of a series of resignations and terminations of GTT's senior officers in the wake of the Interoute debacle and rampant accounting problems, following Defendants Calder and Fraser out the door. This wholesale clear-out of

GTT's CEO and top accounting officers showed that the accounting problems plaguing GTT were not limited to one accountant's mistakes or one rogue individual's transgressions, rather they were symptoms of gross systematic failures of the Company's entire internal controls and processes surrounding its financial reporting.

156.   On December 22, 2020, GTT filed a current report with the SEC on Form 8-K, which detailed the scope of the accounting review and disclosed some of the interim findings of accounting problems:

> The Review has been examining the accounting for Cost of Telecommunications Services and certain other line items in the Company's previously issued financial statements. At this time, the Review has identified a number of errors in connection with the Company's previously issued financial statements, including: (1) errors in accounting for Cost of Telecommunications Services during the years ended December 31, 2019, 2018 and 2017, and the quarter ended March 31, 2020 including (a) errors resulting from the Company's failure to utilize a comprehensive process to record and account for Cost of Telecommunications Services in the proper periods; (b) adjustments made without adequate support during the year ended December 31, 2019 and the quarter ended March 31, 2020 that had the effect of removing expenses from the Company's consolidated statement of operations at quarter-end and then recognizing certain of those expenses as Cost of Telecommunications Services in subsequent quarters; and (c) failures during the years ended December 31, 2018 and 2017 to recognize certain expenses as Cost of Telecommunications Services on the Company's consolidated statement of operations by recording such expenses to goodwill and thereby attributing such expenses to pre-acquisition accruals, without adequate support, for companies that had been acquired; (2) failures to recognize sufficient bad debt expense during

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the year ended December 31, 2019, and the overstatement of bad debt expense for the quarter ended March 31, 2020; and (3) overstatement of the reserve for credits to be issued to customers as of December 31, 2017 and understatements of the reserve for credits to be issued to customers as of December 31, 2019 and 2018, and March 31, 2020, which affected the timing of reductions to Revenue.

157. Continuing, the December 22, 2020 8-K explained that the review was also still examining transactions from 2016:

The Review is continuing and there is no assurance that additional items will not be identified. Among other things, the Review is examining the accounting for certain intercompany transactions recorded during the years ended December 31, 2019, 2018, 2017 and 2016, and each of the quarters during the years ended December 31, 2019, 2018, 2017 and 2016.

158. In the same filing, GTT also announced that its Board had concluded that the Company's previously issued annual financial statements for 2017-2019, and each of the quarters during 2018-2019 and the first quarter of 2020, should no longer be relied upon. The same 8-K also provided "the Company's current preliminary estimates of the approximate ranges of aggregate decreases in Operating Income (and equivalent increases in Loss Before Income Taxes) due to the errors discovered to date." These decreases represented dramatic proportions of GTT's reported Operating Income and substantial changes to GTT's reported total net losses for each of these periods, as reflected in the chart below:

61

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

| Affected Period | Reported Operating Income (in millions) | Estimated Decrease (in millions) | Decrease as % of Operating Income | Decrease as % of Total Net Loss |
|---|---|---|---|---|
| 2017 | $25.4 | $3-5 | 12-20% | 4-7% |
| 2018 | $39.7 | $25-39 | 63-98% | 10-16% |
| 2019 | $123.3 | $17-30 | 14-24% | 16-28% |
| 1Q 2020 | $9.2 | $4-8 | 43-87% | 5-10% |

159.   On February 11, 2021, the NYSE granted the Company's request to extend the cure period for filing its restated financials through August 17, 2021. As the Company disclosed in a current report filed with the SEC on Form 8-K on February 16, 2021:

> On February 11, 2021, the NYSE granted the Company's request for an Additional Cure Period through August 17, 2021, subject to reassessment by the NYSE on an ongoing basis. The NYSE will continue to closely monitor the Company's progress with its timeline for returning to compliance with Section 802.01E. The NYSE may suspend trading in the Company's common stock on the NYSE and commence delisting procedures prior to the end of the Additional Cure Period, if circumstances warrant. In addition, in the event the Company does not file the Late Reports or subsequent delayed periodic SEC filings with the SEC by August 17, 2021, the NYSE stated that it will move forward with the initiation of suspension and delisting procedures.

160.   On March 16, 2021, GTT filed with the SEC a Form NT 10-K notification of the Company's inability to timely file its annual report for 2020 on Form 10-K ("2020 NT 10-K"). The 2020 NT 10-K stated, in relevant part, the following regarding the delay in the annual report:

> The Company does not anticipate filing the 2020 Form 10-K on or before March 31, 2021, the extended period

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

provided for the filing under Rule 12b-25(b) of the Securities Exchange Act of 1934, as amended, and the Company is unable to predict a specific filing date for the 2020 Form 10-K at this time. However, as previously disclosed, the Company intends to work diligently to file the Restated Financial Statements, the Q2 Form 10-Q, the Q3 Form 10-Q, the 2020 Form 10-K and any subsequent delayed periodic SEC filings by no later than August 17, 2021, which is the last day of the additional cure period the New York Stock Exchange (the "NYSE") has provided (subject to reassessment by the NYSE on an ongoing basis) for the Company to return to compliance with the timely filing criteria set forth in Section 802.01E of the NYSE Listed Company Manual.

161. On May 10, 2021, GTT filed with the SEC a Form NT 10-Q notification of the Company's inability to timely file its quarterly report for the first quarter of 2021 ("1Q21 NT 10-Q"). The 1Q21 NT 10-Q stated, in relevant part, the following regarding the delay in the quarterly report:

The Company does not anticipate filing the Q1 2021 Form 10-Q on or before May 17, 2021, the extended period provided for the filing under Rule 12b-25(b) of the Securities Exchange Act of 1934, as amended, and the Company is unable to predict a specific filing date for the Q1 2021 Form 10-Q at this time. However, the Company intends to work diligently to file the Restated Financial Statements, the Q2 Form 10-Q, the Q3 Form 10-Q, the 2020 Form 10-K, the Q1 2021 Form 10-Q and any subsequent delayed periodic SEC filings as soon as possible.

162. On July 2, 2021, GTT filed a current report with the SEC on Form 8-K, which disclosed that the NYSE would be delisting GTT's common stock due to

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

the Company's continued failure to file its quarterly or annual reports. The July 2, 2021 8-K stated, in part:

> On July 2, 2021, the Company informed the NYSE staff that it does not expect to complete and file the Restated Financial Statements and the Delayed Filings before the end of the Additional Cure Period. The NYSE staff indicated that the exchange will immediately suspend trading of the Common Stock on the NYSE and commence proceedings to delist the Common Stock from the NYSE. The Company does not intend to appeal the NYSE's delisting determination. The Company expects that the NYSE will subsequently file a Form 25 with the SEC, which will remove the Common Stock from listing on the NYSE and from registration under Section 12(b) of the Exchange Act. Since the Company's Common Stock was registered under Section 12(g) of the Exchange Act prior to its listing on NYSE MKT LLC in 2013, the registration under Section 12(g) of the Exchange Act will again become operative upon the effectiveness of the deregistration under Section 12(b) of the Exchange Act.

> At this time, the Company does not know whether the Common Stock will be quoted on the Pink Open Market operated by OTC Markets Group Inc. or on any other market or quotation system following suspension of trading on the NYSE. Any quotation of the Common Stock on the Pink Open Market would require a market maker to sponsor the security and comply with Rule 15c2-11 under the Securities Exchange Act of 1934 before it can initiate such quotation. To the extent the Common Stock is quoted on the Pink Open Market or another market, the Company expects such market may provide significantly less liquidity than the NYSE, and trading prices of the Common Stock may decline.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

163.   On July 21, 2021, the NYSE filed a Form 25-NSE, formally confirming the NYSE's delisting of GTT.

164.   As of July 30, 2021, GTT still had not filed any of its delayed quarterly or annual reports, and had not issued restatements of the financial reports affected by the accounting problems identified the prior year.

165.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## <u>PLAINTIFF'S CLASS ACTION ALLEGATIONS</u>

166.   Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired GTT securities publicly traded on the NYSE during the Class Period, and who were damaged thereby ("Class"). Excluded from the Class are Defendants, the officers and directors of GTT and its subsidiaries, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

167.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, GTT securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

168.   Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

169. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

170. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of GTT;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether the Defendants caused GTT to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false filings;

- whether the prices of GTT securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

171. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

172. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things: (a) during the Class Period, Defendants made public statements of material fact that were false, misleading, or were rendered misleading because of Defendants' failure to disclose material facts necessary to prevent such statement from being misleading; (b) as a result of the false and misleading statements and omissions of material fact, GTT securities traded at artificially inflated prices during the Class Period; (c) Plaintiff and other members of the Class purchased or otherwise acquired GTT securities relying on the integrity of the market price of those securities and market information relating to the Company, and have been damaged thereby.

173. During the Class Period, the artificial inflation of GTT securities was caused by Defendants' material misrepresentations and omissions as described above, causing the damages sustained by Plaintiff and the other members of the Class. Defendants' material misrepresentations and omissions created an unrealistically positive assessment of GTT and its business, operations, and prospects, causing the price of the Company's securities to be artificially inflated at all relevant times, including when Plaintiff and other members of the Class purchased the stock. When the truth hidden by these misrepresentations and omissions was disclosed, that disclosure negatively affected the value of the Company's securities, dissipating the artificial inflation and damaging Plaintiff and other members of the Class.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

174. The market for GTT securities, and in particular GTT common stock, was an efficient market at all times during the Class Period for the following reasons, among others::

- GTT shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

- On average, over 4 million shares, representing well over 2.0% of the Company's total shares outstanding, were traded weekly during the Class Period;

- As a regulated issuer, GTT filed periodic public reports with the SEC;

- GTT regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

- GTT was followed by at least 20 securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available, and entered the public marketplace;

- The price of GTT securities responded quickly to incorporate and reflect new public information concerning the Company during the Class Period.

175. Based on the foregoing, the market for GTT securities promptly digested current information regarding GTT from all publicly available sources and reflected such information in the prices of the securities. Under these

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

circumstances, all purchasers of GTT securities during the Class Period suffered similar injury through their purchase of GTT securities at artificially inflated prices, and thus are entitled to a presumption of reliance.

176. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are in large part grounded on Defendants' omissions of material facts in their Class Period statements in violation of Defendants' duty to disclose such facts. Thus, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld were material in that a reasonable investor might have considered them important in making investment decisions. Here, the misleadingly omitted facts were material, so the presumption applies.

## COUNT I

### For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder Against All Defendants

177. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

178. This Count is asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

179. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

180.   Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;
- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of GTT securities during the Class Period.

181.   Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of GTT were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These Defendants by virtue of their receipt of information reflecting the true facts of GTT, their control over, and/or receipt and/or modification of GTT's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning GTT, participated in the fraudulent scheme alleged herein.

182.   The Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

facts in the statements made by them or other GTT personnel to members of the investing public, including Plaintiff and the Class.

183.   As a result of the foregoing, the market price of GTT securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of GTT securities during the Class Period in purchasing GTT securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

184.   Had Plaintiff and the other members of the Class been aware that the market price of GTT securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased GTT securities at the artificially inflated prices that they did, or at all.

185.   As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

186.   By reason of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of GTT securities during the Class Period.

187.   This action was filed within five years of each Class member's purchase of GTT common stock and within two years of the discovery of the Defendants' fraudulent statements. It is therefore timely.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

188.  Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

189.  During the Class Period, the Individual Defendants participated in the operation and management of GTT, and conducted and participated, directly and indirectly, in the conduct of GTT's business affairs. Because of their senior positions, they knew the adverse non-public information about GTT's misstatement of revenue and profit and false financial statements.

190.  As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to GTT's financial condition and results of operations, and to correct promptly any public statements issued by GTT which had become materially false or misleading.

191.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which GTT disseminated in the marketplace during the Class Period concerning GTT's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause GTT to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of GTT within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of GTT securities.

192.  The Individual Defendants, therefore, each acted as a controlling person of the Company. By reason of their senior management positions and/or

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

being directors of the Company, the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. The Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

193.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by GTT.

194.   This action was filed within five years of each Class member's purchase of GTT common stock and within two years of the discovery of the Defendants' fraudulent statements. It is therefore timely.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of itself and the Class, prays for judgment and relief as follows:

A.   Determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Dated: August 17, 2021

**THE ROSEN LAW FIRM, P.A.**

By: _/s/ Laurence M. Rosen_
Laurence M. Rosen (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Phillip Kim (*pro hac vice*)
Joshua Baker (*pro hac vice*)
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: pkim@rosenlegal.com
Email: jbaker@rosenlegal.com

*Lead Counsel for Lead Plaintiff and the Class*

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS

## **CERTIFICATE OF SERVICE**

I, Laurence M. Rosen, hereby declare under penalty of perjury as follows:

I am the managing attorney of The Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA 90071. I am over the age of eighteen.

On August 17, 2021, I electronically filed the foregoing CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record. Executed on August 17, 2021.

*/s/ Laurence M. Rosen*
Laurence M. Rosen

CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR
VIOLATIONS OF THE FEDERAL SECURITIES LAWS